UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KYLE FRANKS,

                          Plaintiff,

        – against –

NEW ROCHELLE POLICE DEPARTMENT,
POLICE OFFICER D'ERASMO, and
POLICE OFFICER CASTIGLIA,

                        Defendants.

**<u>OPINION AND ORDER</u>**
13 Civ. 636 (ER)

<u>Ramos, D.J.</u>:

      Kyle Franks ("Plaintiff"), currently incarcerated and appearing *pro se*, brings this action against the New Rochelle Police Department, Police Officer Paul D'Erasmo ("D'Erasmo"), and Police Officer Adam Castiglia ("Castiglia," and collectively, "Defendants") pursuant to 42 U.S.C. § 1983.  Amended Compl. (Doc. 9).  Plaintiff alleges that Defendants violated his civil rights by using excessive force against him when arresting him and holding him in their custody on December 3, 2012.  *Id.*[1]  Specifically, Plaintiff alleges that D'Erasmo and Castiglia pulled him, pushed him, and applied unnecessary force to his neck while trying to get him into the back of a patrol car, *id.*, and that they handcuffed him for an unreasonable amount of time.  Pl.'s Mem. Law Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Opp'n") (Doc. 56) at 3-4.  As relief, he seeks damages in the amount of $250,000 and "ask[s] the Courts to investigate the New Rochelle Police Department and all of [its] officers."  Amended Compl. at V.

---

[1] Plaintiff's allegations in his Amended Complaint may be construed as representing claims for (1) excessive force; (2) deliberate indifference to his serious medical needs; and (3) false arrest and malicious prosecution.  However, in Plaintiff's memorandum of law in opposition to Defendants' motion for summary judgment, he "withdr[ew] all complaints, allegations, and cause[s] of actions **except** for that which is grounded in excessive force."  Pl.'s Mem. Law Opp'n to Defs.' Mot. Summ. J. (Doc. 56) at 1 (emphasis in original).  Accordingly, the Court dismisses all causes of action, besides excessive force, raised in Plaintiff's Amended Complaint.

Defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Doc. 45. For the following reasons, Defendants' motion is GRANTED in part and DENIED in part.

# I.   BACKGROUND

## A.   Factual Background[2]

This action stems from Plaintiff's two arrests by officers of the New Rochelle Police Department on November 8, 2012 and December 3, 2012. Plaintiff maintains that, on November 8, 2012, he was arrested without cause, harassed, racially profiled, and assaulted by Officer D'Erasmo and that on December 3, 2012, he was arrested in retaliation for a civilian complaint that he had filed against D'Erasmo and subjected to excessive force by D'Erasmo and Castiglia. In this action, he seeks redress only for the officers' use of excessive force during the second arrest. Defendants maintain that both arrests were lawful and that, on December 3, 2012,

---

[2] Under Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rule 56.1"), a party moving for summary judgment pursuant to Rule 56 must submit a "separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local R. 56.1(a). Each statement must be accompanied by a citation to admissible evidence. Local R. 56.1(d); *see also* Fed. R. Civ. P. 56(c) (requiring reliance on admissible evidence in the record to support or controvert a purported material fact). Rule 56.1 requires a party opposing summary judgment to submit, with his opposition, a statement responding to each of the moving party's proposed undisputed facts, along with citations to admissible evidence. Local R. 56.1(b) & (d). If the moving party seeks summary judgment against a *pro se* litigant, it is also required to notify the *pro se* litigant of the requirements of Rule 56 and Local Rule 56.1. Local R. 56.2. Defendants have complied with their obligations insofar as they submitted a Local Rule 56.1 Statement and provided Plaintiff with notice of the potential consequences of not responding to the motion. Docs. 48, 49. Plaintiff did not submit a 56.1 statement with his opposition papers. However, a district court has "broad discretion to determine whether to overlook a party's failure to comply with local court rules," and "may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file [a Local Civil Rule 56.1] statement." *Smith v. City of New York*, No. 12 Civ. 4892 (JPO), 2014 WL 5324323, at *3 n. 1 (S.D.N.Y. Oct. 20, 2014) (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001)). "Where the court's independent review of the record yields evidence contrary to a given assertion in the moving party's Local Civil Rule 56.1 statement, or where a party fails to support an assertion by citing admissible evidence, the court may reject that assertion." *Id.* On the other hand, statements in the moving party's 56.1 statement that are not contradicted by the court's review of the record will be "deemed admitted as a matter of law." *Chitoiu v. UNUM Provident Corp.*, No. 05 Civ. 8119 (LAP), 2007 WL 1988406, at *1 n. 1 (S.D.N.Y. July 6, 2007). Therefore, facts recited in Defendants' Local Civil Rule 56.1 Statement ("Defs.' 56.1 Statement"), where undisputed or corroborated by the record, are accepted as true for purposes of the instant motion.

Plaintiff resisted arrest, behaved in a violent and threatening manner, and compelled the use of reasonable force by D'Erasmo and Castiglia.

### 1.  *Plaintiff's November 8, 2012 Arrest*

On November 8, 2012, D'Erasmo was on patrol in the vicinity of Brook Street and Horton Avenue in New Rochelle, New York when he observed a group of people gathered around a parked black BMW.  Defendants' Local Rule 56.1 Statement of Material Facts Not in Dispute ("Defs.' 56.1 Statement") ¶¶ 13-14.   No one was seated in the car, but its engine was running, and its stereo system was blaring loud music.  *Id.* ¶¶ 14, 17.  The car belonged to Plaintiff's friend Christine, but Plaintiff was driving it that day.  *Id.* ¶ 18.  As D'Erasmo approached the car, Plaintiff exited a nearby deli and walked toward the vehicle also.  *Id.* ¶¶ 15, 19.  D'Erasmo attempted to inform Plaintiff that he would be issued a violation for the "unreasonable noise" coming from the vehicle, but Plaintiff walked away.  *Id.* ¶ 20.  D'Erasmo tried to stop him but, according to Defendants, Plaintiff "flared his arms and legs aggressively and screamed, 'Get the fuck off me!'"  *Id.*

D'Erasmo grabbed Plaintiff by his left arm, turned him around, and asked to see his identification.  *Id.* ¶¶ 21-22.  Plaintiff initially refused, demanding instead to see D'Erasmo's identification.  *Id.* ¶¶ 22-34.  Although Plaintiff eventually provided his identification, he continued to argue with D'Erasmo, shouting and cursing as onlookers gathered around.  *Id.* ¶¶ 24-27.  D'Erasmo called for additional officers, and Sergeant Christopher, Officer Fudge, and Officer Martinez reported to the scene as back-up.  *Id.* ¶¶ 28-29.  D'Erasmo arrested Plaintiff for disorderly conduct.  *Id.* ¶ 30.  While D'Erasmo was patting Plaintiff down, Plaintiff allegedly informed D'Erasmo that he had marijuana in his pocket, and D'Erasmo recovered a substance that appeared to be marijuana from Plaintiff's pocket.  *Id.* ¶¶ 31-33.  During his arrest, Plaintiff

3

initially refused to get into D'Erasmo's patrol car, despite D'Erasmo's repeated demand that Plaintiff "get in the car."  *Id.* ¶¶ 34-35.

D'Erasmo's patrol car was equipped with a rear-facing camera, which recorded video of his interaction with Plaintiff that day and recorded audio from the moment when the patrol car door was first opened for Plaintiff to get inside.  Odessky Aff. (Doc. 46), Ex. H.[3]  As captured on this video, when D'Erasmo tried to push Plaintiff into the car, Plaintiff stated, "Stop pushing me in the car," and "Stop being so rough."  *Id.*  He refused to get into the car, saying, "Sarge, tell him to let me get into the car," and calling out, "Yo, you see this, right . . . somebody pull out they phone my niggas . . . they just pushed my head into the car! . . . I'm not getting in the fuckin car!"  *Id.*  After Plaintiff finally did get into the car, D'Erasmo drove him to police headquarters.  *Id.*  During that ride, Plaintiff warned D'Erasmo that he would "lose [his] fucking job" and "be doing paperwork."  *Id.*

Following this encounter, Plaintiff was charged with three counts of disorderly conduct and one count of unlawful possession of marijuana.  Defs.' 56.1 Statement ¶ 44; Doc. 46, Ex. I.[4]  After a trial, he was convicted of two counts of disorderly conduct and sentenced to fifteen days in the Westchester County Jail.  *Id.*

Later, Plaintiff filed a "Civilian Complaint Form" against D'Erasmo based on the Officer's conduct on November 8, 2012.  *Id.*, Ex. J.[5]  In the Complaint, Plaintiff wrote:

> I feel that this cop should not be the one who should be serving. . . . On Nov. 8, 2012 on or about 12:25 pm I was going to the store on Horton + Brook and a cop

---

[3] All references to exhibits pertain to those exhibits attached to the affidavits of Susan Odessky submitted in support of Defendants' memorandum of law and reply memorandum of law in support of their motion for summary judgment.  Exhibit H is footage of Plaintiff's November 8, 2012 arrest obtained from the rear-facing camera in Officer D'Erasmo's vehicle.

[4] Exhibit I is a "Certificate of Disposition" from the New Rochelle City Court Criminal Division.

[5] Exhibit J is a copy of Plaintiff's Complaint.  Defendants observe, and it clear from the record in this case, that when Plaintiff refers to "Pauly D," he is speaking of Officer D'Erasmo.  *See* Defs.' 56.1 Statement at 5 n. 2.

> came and grab me + asked for ID, Then I asked him for ID.  The next thing I
> know he says how [sic] car is this I asked How [sic] car is it.  Then the next thing
> I know I was being locked up and beat on in front of other cops that were on the
> sense [sic].  I feel hurt as the man or person.

*Id.*  During his deposition, Plaintiff was asked what he meant when he said, in the complaint that

he was "beat on."  Franks Depo. 104.  Plaintiff stated only that D'Erasmo was "pushing [him] in

the car," and "pushing on [his] chest."  *Id.*  According to Plaintiff, after he submitted his

complaint to someone at the station "front desk," an officer called his house to discuss the

complaint when he was not there.  *Id.*  When he returned the call, he spoke with an officer who

was "very abusive with his language" such that Plaintiff "just took his badge number and hung

up."  *Id.* at 104-05.  Pressed as to that officer's words, Plaintiff stated, "He said that he'd seen

some tape, and I was the aggressor.  And he was just basically – I think that was it."  *Id.* at 105.

    In an affidavit, Lieutenant Gary Robinson ("Lieutenant Robinson") of the New Rochelle

Police Department Internal Affairs Department stated that he received Plaintiff's complaint and,

in November 2012, telephoned him to interview him about it.  Robinson Aff. (Doc. 46, Ex. JJ)

¶¶ 8, 10.  Lieutenant Robinson claimed that he left his contact information with an "unidentified

woman" who answered the phone, but that Plaintiff never returned his call.  *Id.* ¶ 10.  However,

Lieutenant Robinson reviewed the Event Report (Doc. 46, Ex. E), officer narratives (Doc. 46,

Ex. G), and patrol vehicle camera footage (Doc. 46, Ex. H) of Plaintiff's November 8, 2012

arrest and determined that D'Erasmo had not used excessive force.  *Id.* ¶ 11.  Lieutenant

Robinson did not inform D'Erasmo of Plaintiff's complaint until after Plaintiff was arrested

again, on December 3, 2012.  *Id.* ¶ 14.

### 2.    *Plaintiff's December 3, 2012 Arrest*

    On the morning of December 3, 2012, Plaintiff visited Junior's Mini Mart, a store located

at 453 Fifth Avenue in New Rochelle (the "Mini Mart").  Defs.' 56.1 Statement ¶ 48; Franks

5

Depo. (Doc. 46, Ex. FF) at 53, 57.  Plaintiff entered the Mini Mart, of which he was a frequent customer, at 8:26 AM, and had an "altercation or verbal dispute" with the store clerks, Pranay and Kalpesh Patel, which was captured on the store's surveillance camera.  Doc. 46, Ex. Q[6]; Franks Depo. at 57.[7]  The Patels reported that Plaintiff verbally and physically threatened them while shouting profanities.  Defs.' 56.1 Statement ¶¶ 58, 60-61, 68.   Eventually—in Plaintiff's words—he became "hotheaded" and knocked over a tray holding approximately sixteen dollars' worth of buttered rolls and then knocked over a garbage can, spilling its contents onto the floor, and left the store.  *Id.* ¶¶ 62, 64-65; Franks Depo. 59.  Kalpesh Patel telephoned the police and asked for an officer to report to the store.  Doc. 46, Ex. S.[8]  Castiglia and D'Erasmo separately reported to the store and spoke with the Patels, who showed them the surveillance camera footage and indicated that they wished to press charges.  Defs.' 56.1 Statement ¶¶ 74-79. D'Erasmo recognized the individual in the video as Plaintiff, who he had arrested on November 8, 2012.  *Id.* ¶ 83.  A store employee informed Castiglia and D'Erasmo that Plaintiff lived down the street, and the officers split up to conduct separate canvasses of the area.  *Id.* ¶¶ 84-85.

Meanwhile, Plaintiff returned to the home where he lived with his grandmother and his cousin, Dejon Boyd ("Boyd").  Franks Depo. at 59-62.  There, he and Boyd got into the car of a woman named Kim.  *Id.* at 62-63.  Before they could exit the parking lot, however, they were pulled over by Castiglia, who was joined shortly thereafter by D'Erasmo.  Defs.' 56.1 Statement

---

[6] Exhibit Q is a video taken from the store's surveillance system containing footage of the dispute.

[7] Accounts differ as to the reason for that argument:  According to the Patels, Plaintiff became belligerent when he was told that they did not have a lighter to give him and could provide him only with matches.  Pranay Patel Aff.; Kalpesh Patel Aff.  According to Plaintiff, the fight stemmed from his request for the Patels to convert coins that he received as change for a purchase at the store into dollar bills.  Franks Depo. 58-59.  But there is no dispute about the fact that Franks and the Patels had a heated disagreement.  *Id.* 57; Pranay Patel Aff.; Kalpesh Patel Aff.

[8] Exhibit S is a recording of Kalpesh Patel's 911 call.

¶¶ 88-92.  Castiglia advised Plaintiff that he was under arrest, patted him down for weapons, and handcuffed his arms behind his back.  *Id.* ¶¶ 97-99.

What transpired next, while disputed by Plaintiff and Defendants, was captured in part by two separate video and audio recordings:  a lengthy recording from the rear-facing camera in Castiglia's patrol car (Doc. 46, Ex. U), and four brief, disjointed clips downloaded from Boyd's cell phone (Doc. 46, Ex. T).

As the officers walked Plaintiff from the front of the police car, where he was patted down, to the back left door through which the officers wanted him to enter the car, Plaintiff stated, "Fix my cuffs . . . tell him to fix my cuffs, Pauly . . . fix my fuckin cuffs!"  Doc. 46, Ex. T.  Plaintiff did not specify whether the handcuffs were too tight or indicate what else he wanted them to fix.  The officers ignored his demands and attempted to get him into Castiglia's patrol car, but he refused.  *Id.*, Ex. U.  D'Erasmo walked around to the back right side of the car, leaned into the car through the back right door, and attempted to pull on Plaintiff's arms and handcuffs from behind while repeatedly directing him to "get in the car."  *Id.*  Castiglia and Plaintiff, who were standing on the left side of the car, were not in the frame of the in-car camera during this time, but Plaintiff can be heard refusing to enter the car without a sergeant present and demanding that they get off of him and stop pushing on his chest.  *Id.*

The officers then switched places so that Castiglia was leaning into the car through the back right door, pulling on Plaintiff's arms and handcuffs from behind, while D'Erasmo stood out of view, in front of Plaintiff on the left side of the car.  *Id.*  According to Plaintiff, D'Erasmo was pushing him from the front during this time.  Franks Depo. 71-72.  Eventually, Plaintiff fell backwards into the car.  Doc. 46, Ex. U.  As he did, Castiglia pulled the back of the hood on his sweatshirt, then, for a period of approximately three seconds, placed his arm around Plaintiff's

neck in what appears on the patrol car video to be a chokehold, and then pulled on the top of the hood of Plaintiff's sweatshirt.  *Id.*  It appears in the video that Castiglia placed pressure on Plaintiff's throat for approximately fifteen seconds during the time he attempted to wrestle Plaintiff into the car.  *Id.*; *see also* Franks Depo. 72 (noting that Castiglia was "pulling [his] hood from behind which was causing [him] to choke" while D'Erasmo pushed him from the front). Meanwhile, Plaintiff made a noise that suggested that he was choking, gasping for air, and in distress.  Doc. 46, Ex. U.  These noises, and Boyd's demand that the officers stop choking his cousin, are also audible on the video from Boyd's cell phone.  *Id.*, Ex. T.[9]

As soon as Castiglia released Plaintiff's hood, Plaintiff rapidly scooted out of the car toward D'Erasmo, jumped to his feet, and began bobbing and flailing his upper body while screaming, "I'm gonna fucking kill you."  *Id.*, Ex. U.  Castiglia walked around to the left side of the car, so that both officers were in front of Plaintiff.  *Id.*  At this point, Defendants maintain, Plaintiff head-butted both officers.  Defs.' 56.1 Statement ¶¶ 116-17.  The alleged head-butting was not captured on the in-car camera, because Plaintiff and Defendants were standing out of its frame; nor was it captured clearly on Boyd's cell phone, which shows only that Plaintiff flailed his head and body but, contrary to Defendants' assertions, does not depict an obvious head-butting.  *See* Doc. 46, Ex. T.[10]  However, Plaintiff repeatedly boasted about having head-butted the officers while he was being transported to the police station and held in custody, and these

---

[9] During his deposition, Boyd recalled, "They was choking him.  He couldn't breathe."  Boyd Depo. at 51, 55. Boyd claimed that he was able to see this choking, even though Plaintiff was in the back seat of the patrol car when it occurred, and the choking is not visible on Boyd's cell phone video.  At first, Boyd stated that he could not describe *how* Plaintiff was being choked, *id.* ("I don't know.  He was just being choked.  You could hear me on the tape yelling, 'Stop it. You're killing him.'"), but he later claimed to have seen the Officers use their hands and arms to choke Plaintiff and pull him back and forth in "a tug of war motion" while Plaintiff was handcuffed.  *Id.* at 55-56.

[10] When Plaintiff was asked, during his deposition, whether he had head-butted or otherwise injured the officers, he stated that he did not recall.  Franks Depo. at 98-100.  Boyd, during his deposition, acknowledged that he heard Plaintiff threaten the officers but stated that it did not appear from his video as if Plaintiff had actually hit them with his head.  Boyd Depo. at 67-68.

boasts were captured on video.  *See* Doc. 46, Exs. U, W,[11]  X.[12]  In addition, Plaintiff later pleaded guilty to Assault in the Second Degree based on this incident.  Franks Depo. at 97; Uniform Sentence & Commitment Form (Doc. 46, Ex. AA).

Only after Castiglia suggested to D'Erasmo that he use a Taser to gain Plaintiff's compliance did Plaintiff cease resisting arrest and enter the patrol car.  Franks Depo. at 74; Defs. 56.1 Statement ¶ 123.  Castiglia then transported him to the Mini Mart for a show-up identification, during which Plaintiff sat in the back of the police car while Kalpesh Patel identified him as having caused the disturbance at the store.  *Id*. ¶¶ 128, 134-35.  After the show-up procedure, D'Erasmo drove to the hospital to seek medical treatment for his injuries[13] while Castiglia transported Plaintiff to police headquarters.  *Id*. ¶¶ 144-45.

During the ride to the Mini Mart and from the Mini Mart to the station—a total of six minutes in the car—Plaintiff made these and other comments to Castiglia, as captured on video: (1) "I'm gonna kill you nigga. . . . When I catch you out that uniform I'm gonna blow your fucking top off.  I'm dead serious.  So you better have your gun on you every day," (2) "I'm gonna knock you the fuck out once these cuffs come off," (3) "You saw I was head-butting you nigga," (4) "I'm gonna blow your fucking head off your shoulders.  In front of your kids, in front of everybody," and (5) in response to Castiglia's efforts to read Plaintiff his *Miranda* rights, "You got the right to get your ass whooped!"   Doc. 46, Ex. U.  According to an arrest report prepared by Officer Castiglia, Plaintiff was impaired by drugs and alcohol at the time of his

---

[11] Exhibit W contains footage from the Sally Port surveillance camera.

[12] Exhibit X contains footage from a surveillance camera instead the police station.

[13] Both officers sustained injuries as a result of the head-butting.  At the hospital, D'Erasmo received treatment for head pain and swelling, facial bruising, a deviated septum, and a strained right wrist and forearm.  Defs.' 56.1 Statement ¶¶ 36-37.  As a result of his injuries and a surgery to repair his deviated septum, D'Erasmo missed eight or nine weeks of work and was forced to refrain from his full duties for another two weeks.  *Id.* at 40-43.  Officer Castiglia sustained head pain, dizziness, facial swelling, and finger pain.  Castiglia Aff. (Doc. 46, Ex. II) ¶ 38.

arrest.  Doc. 46, Ex. O.  While riding to the station, he emitted sounds that indicated that he was in pain or distress.  *Id.*, Ex. U.

After Castiglia and Plaintiff arrived at police headquarters, at 9:25 a.m., as depicted on footage from a video surveillance camera in the New Rochelle Police Station "Sally Port," Plaintiff refused to exit the police car without a sergeant present.  *See* Doc. 46, Ex. W. Castiglia pulled Plaintiff out of the car by his left leg and continued holding his leg while another officer, Officer Siller, supported Plaintiff by holding his right arm and Plaintiff hopped on his right foot into the station.  *Id.*  When they reached a flight of stairs leading inside from the Sally Port, Castiglia and Siller carried plaintiff to the top and placed him on the ground, and Castiglia dragged Plaintiff into the station by the leg of his pants.  *Id.*  Footage from a video camera in the station captured Plaintiff hollering, "Hey, y'all see this?  They're draggin' me in!"  *Id.*, Ex. X. Next, Castiglia placed Plaintiff face down on the floor and searched him, while Plaintiff shouted, repeatedly threatened to kill Castiglia, and flailed about.  *Id.*  Plaintiff also shouted at this time, "Sarge, the handcuffs are on wrong!"  *Id.*.  Someone stated, "Alright, alright, we'll take care of it."  *Id.*  Castiglia continued searching Plaintiff, who remained agitated, and told him, "Calm down, we're gonna loosen them up."  *Id*.  Castiglia slowly removed Plaintiff's handcuffs, with four officers standing by, and replaced them with a different set, saying, "They're on right now." *Id.*  Castiglia then placed Plaintiff in a holding cell.  *Id.*

The record includes approximately two hours of footage showing Plaintiff in that cell.  *Id*. During that time, Plaintiff repeatedly boasted about head-butting the officers, threatened to harm or kill multiple officers and their family members, spat at Castiglia and another officer, complained that his arresting officer had beat him up, and demanded to see Lieutenant Robinson with regard to his complaint against D'Erasmo.  *Id.*  He also asked numerous officers to remove

10

his handcuffs, shouted, "Why am I cuffed behind a gate?" and warned at least one officer that he

would "knock [him] the fuck out" if the officer did not remove his handcuffs.  *Id.*

According to Defendants, at approximately 11:47 a.m., five officers from the Critical

Incident Unit ("CIU") with special training in handling aggressive arrestees responded to a report

that Plaintiff was threatening and spitting on officers.  *See Id.*, Ex. N.[14]  They left his hands

cuffed behind his back, placed "flex" cuffs on his feet, placed a "spit shield" over his head, and

transported him without incident from the holding cell to "male cell # 8."  *Id.*[15]  Although

Defendants provide no evidence to demonstrate that Plaintiff's handcuffs were removed at that

time, they state that he was placed in male cell number eight at 12:00 p.m. and that cells in the

cell block—unlike the holding cell where Plaintiff was initially detained—have slots in the doors

that allow an arrestee to put their hands through for officers to remove their handcuffs after an

officer places them in a cell.  Second Robinson Aff. (Doc. 58, Ex. LL) ¶¶ 7, 17.  The surveillance

video of the holding cell provided to the Court by Defendants terminates at 11:39:18 a.m., and

thus does not capture these events.  Doc. 46, Ex. X.[16]

Later that day, Plaintiff was transferred to the Westchester County Jail.  Franks Depo. at

36.  Although neither Defendants nor Plaintiff highlight the time of his transfer, a "Prisoner's

Daily Log" recording his movements on December 3, 2012 indicates "WCJ" as Plaintiff's

activity at "1630," which would support the proposition that he was transferred at 4:30 p.m.  *Id.*,

Ex. Y.  Plaintiff maintains that he was handcuffed from his arrest at 9:16 a.m. until his transfer

---

[14] Exhibit N is an Event Report created by Detective Michael Bota on December 5, 2012 to document the actions of these officers.

[15] Plaintiff describes these events in his Amended Complaint as follows:  "During my time [at] the headquarters I was cuffed at both of my ankles and hands and put in a cell with a bag over my head."  Amended Compl. at II.D.

[16] Regardless, as discussed *infra*, Defendants assert that because D'Erasmo was at the hospital and Castiglia left the holding cell area at 11:09 a.m., neither was personally involved beyond that point.  Defs.' Reply (Doc. 57) at 3.

to the County Jail, Franks Depo. at 92, a period of more than seven hours.[17]   As a result, he

states that he still requires medical attention and has experienced pain, numbness, and a "loss of

range of motion" in his arm.  Pl.'s Opp'n at 5.[18]

Based on the events of December 3, 2012, including Plaintiff's conduct at the Mini Mart

and his behavior during his arrest, he eventually pleaded guilty to assault in the second degree,

criminal mischief in the fourth degree, and harassment in the second degree.  Doc. 46, Ex. AA.

### B.  Procedural Background

On January 28, 2013, Plaintiff filed an initial complaint in the format of a letter addressed

to various judges, government officials, and governmental entities.  Compl. (Doc. 1) at 1.  On

April 17, 2013, the Court granted Plaintiff leave to amend and provided him with some direction

as to the nature of the information he needed to include.  Order to Amend (Doc. 6).  Plaintiff

filed an Amended Complain on July 9, 2013.  Amended Compl. (Doc. 9).  Defendants filed an

Answer on February 20, 2014 (Doc. 16) and filed the instant motion for summary judgment on

December 31, 2014.  Mot. for Summ. J. (Doc. 45).  Plaintiff opposes.

The nature and scope of Plaintiff's claims has shifted throughout the course of this action.

In his Amended Complaint, Plaintiff stated that he had been subjected to excessive force, denied

medical attention, falsely detained based on his Civilian Complaint, and abused mentally and

---

[17] The record does not support Plaintiff's (likely mistaken) assertion, in his opposition papers, that his handcuffs were left on from the time of his arrest on December 3, 2012 until January 28, 2014 at 8:16 p.m.  Pl.'s Opp'n at 6. Although Defendants' Exhibit EE is a Westchester County Jail booking sheet dated January 28, 2014, Plaintiff testified during his deposition that he was transferred to the County Jail on December 3, 2012.  Franks Depo. at 36. Exhibit EE appears to be the date on which Plaintiff pleaded guilty, at which point he may have been booked into the Westchester County Jail again.  *See* New Rochelle Police Department Arrest Report Dec. 3, 2012 (printed July 22, 2014) (Doc. 46, Ex. O).

[18] During his deposition, Plaintiff testified that, while at the Westchester County Jail, he received medical treatment in the form of physical therapy and medication for injuries to his hands, and that he suffered from swelling, numbness, tingling in his hands and arm.  Franks Depo. 36-38, 87-93.  As of the time his deposition, Plaintiff's hands were no longer swollen and his only treatment was Ibuprofen, but he reported having "the same issues" that he suffered from after his arrest.  *Id.* at 90-92.

physically.  Amended Compl. at II.D.  He alleged that his injuries included "mental anguish, usage of medication to treat [his] psychological issues as well as the physical damage done to [his] his wrists and for [his] wrongful imprisonment."  *Id*. at III.  However, during his deposition on August 25, 2014, Plaintiff was asked why he was individually suing D'Erasmo and Castiglia and stated that he was suing them only because they pushed him and pulled him into the police car during his arrest.  Franks Depo. at 127-28.  In his opposition to Defendants' motion for summary judgment, filed May 21, 2015, Plaintiff stated that he "withdraws" all claims besides his excessive force claim, which he described exclusively as related to the duration and nature of his handcuffing by Defendants.  Pl.'s Opp'n at 1.

## II.    LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might affect the outcome of the litigation under the governing law.  *Id.*  On a summary judgment motion, the district court "may not make credibility determinations or weigh the evidence . . . . 'Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'"  *Kaytor v. Electric Boat Corp.*, 609 F. 3d 537, 545-46 (2d Cir. 2010) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986).  If the burden of proof at trial would fall on the movant, that party's "own submissions in support of the motion must entitle it to judgment as a matter of law."  *Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F.3d 612, 618 (2d Cir. 1998).  Conversely, "[w]hen the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim."  *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009) (citing *Celotex Corp.*, 477 U.S. at 322-23).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citing *Celotex Corp.*, 477 U.S. at 322-23).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)) (internal quotation marks omitted).  However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise.  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).  The non-moving party must do more than show that there is "some metaphysical doubt as to the material facts[.]"  *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)) (internal quotation mark omitted).  To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor."  *Senno*, 812 F. Supp. 2d at 467-68 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986)).

District courts afford "special solicitude" to *pro se* litigants facing motions for summary judgment, *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988) (citing *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988)), and hold their submission to "to less stringent standards than formal pleadings drafted by lawyers." *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (per curiam) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)); *see also Young v. N.Y.C. Dep't of Educ.*, No. 09 Civ. 6621, 2010 WL 2776835 (SAS), at *5 (S.D.N.Y. July 13, 2010) (noting that the same principles apply to briefs and opposition papers filed by *pro se* litigants).  Although "*pro se* status 'does not exempt a party from compliance with relevant rules of procedural and substantive law,'" *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006) (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)), courts read the pleadings and opposition papers submitted by *pro se* litigants "liberally and interpret them 'to raise the strongest arguments that they suggest.'" *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).  "However, a pro se party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (quoting *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

Finally, where "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see also Brown v. City of New York*, No. 13 Civ. 1018 (KBF), 2014 WL 2767232, at *7 (S.D.N.Y. June 18, 2014) ("Viewing the evidence in the light most favorable to plaintiff—as the Court must on summary judgment—does not require disregarding facts and the incontrovertible record.").

## III.    DISCUSSION

### A.  The New Rochelle Police Department is Not a Proper Defendant

Defendants correctly assert that the Police Department is not properly named as a Defendant in this case. *See* Defs.' Mem. Law Supp. Mot. for Summ. J. (Doc. 47) at 23.  "Under New York law, departments which are merely administrative arms of a municipality, do not have a legal identity separate and apart from the municipality and cannot sue or be sued."  *Hall v. City of White Plains,* 185 F. Supp. 2d 293, 303 (S.D.N.Y. 2002) (citations omitted).  Because "[p]olice departments are just such administrative arms of their corresponding municipality," the New Rochelle Police Department is not a suable entity.  *Wilson v. New Rochelle Police Dep't*, No. 13 Civ. 5997 (NSR), 2014 WL 2624756, at *2 (S.D.N.Y. June 3, 2014), *appeal dismissed* (Aug. 28, 2014) (citing *Qadar v. People of the State of N.Y.,* 396 F. Supp. 2d 466, 469 (S.D.N.Y. 2005); *Baker v. Willett,* 42 F. Supp. 2d 192, 198 (N.D.N.Y. 1999)).  As such, all claims against the New Rochelle Police Department are dismissed with prejudice.[19]

### B.  Plaintiff's Excessive Force Claim

In order to state a claim under 42 U.S.C. § 1983, a plaintiff must allege that: (1) defendants were state actors or were acting under color of state law at the time of the alleged wrongful action; and (2) the action deprived plaintiff of a right secured by the Constitution or federal law.  *Am. Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 49–50 (1999).  "Section 1983 is only a grant of a right of action; the substantive right giving rise to the action must come from another source."  *Singer v. Fulton Cnty. Sheriff,* 63 F.3d 110, 119 (2d Cir. 1995) (citing *Adickes*

---

[19] Additionally, Plaintiff has not alleged, and none of the evidence in the record suggests, that the officers' purported misconduct resulted from any New Rochelle Police Department policy or custom, as would be required to sustain a claim under *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658, 694 (1978).   To the contrary, Plaintiff states in his opposition memorandum that Defendants "have waived the argument and contention" that they were trained to handcuff suspects behind their backs and leave them handcuffed, in a cell, for an "entire work shift," and that Defendants "waive the argument that the New Rochelle Police superiors instructed or sanction this form of restraint."  Pl.'s Opp'n at 5.  He states "the action[s] of defendants exceed[ed] the standard training."  *Id.*

*v. S.H. Kress & Co.,* 398 U.S. 144, 150 (1970)).  Thus, a civil rights action brought under § 1983 will stand only insofar as a plaintiff can prove an actual violation of his rights under the Constitution or federal law.  *Id.*

Here, Plaintiff alleges that he was subjected to excessive force during his arrest and while he was held, pre-arraignment, in the custody of the New Rochelle Police Department.  Excessive force claims that arise "in the context of an arrest or investigatory stop of a free citizen" are "most properly characterized as . . . invoking the protections of the Fourth Amendment." *Graham v. Connor,* 490 U.S. 386, 294 (1989).  The Second Circuit also has indicated that "the Fourth Amendment standard probably should be applied at least to the period prior to the time when the person arrested is arraigned or formally charged, and remains in the custody (sole or joint) of the arresting officer."  *Powell v. Gardner,* 891 F.2d 1039, 1044 (2d Cir. 1989); *see also Blake v. Base,* No. 90 Civ. 0008, 1998 WL 642621, at *11 (N.D.N.Y. Sept. 14, 1998) ("[A]fter *Powell* it seems that if confronted squarely with the issue, the Second Circuit would hold that when a plaintiff alleges that excessive force was used against him before he was arraigned or formally charged, the Fourth Amendment governs such a claim.").  Accordingly, although Plaintiff invokes the Eighth and Fourteenth Amendments in his Amended Complaint, the Court analyzes his claims under the Fourth Amendment.

In evaluating an excessive force claim under the Fourth Amendment, the court must engage in an exclusively objective analysis of the reasonableness of defendants' actions, merely assessing "whether the officers acted reasonably in light of the facts and circumstances of the situation they faced, without regard to their underlying motives or subjective intent toward the suspect." *Anderson v. Branen*, 17 F.3d 552, 559 (2d Cir. 1994) (citing *Graham,* 490 U.S. at 397).  The court is barred from considering subjective factors.  *See id.*

In determining whether the amount of force used by the officers was reasonable, the Court must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396-97 (citing *Tennessee v. Garner,* 471 U.S. 1, 8-9 (1985)). Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396 (citing *Terry v. Ohio, supra,* 392 U.S. 1, 20–22 (1968)). The Court's evaluation "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* However, "in light of 'the fact-specific nature of the inquiry' on an excessive force claim, 'granting summary judgment against a plaintiff on [such a claim] is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable.'" *Rogoz v. City of Hartford*, No. 14-0876, 2015 WL 4716570, at *7 (2d Cir. Aug. 10, 2015) (quoting *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 123 (2d Cir. 2004)).

### 1. *Handcuffing*

Plaintiff's primary argument is that Defendants used excessive force by handcuffing him for a lengthy period of time, during much of which he was also inside of a locked cell. Pl.'s Opp'n at 4. He also argues that the handcuffs were "deliberately left on . . . completely out of malicious and excessive intent." *Id.* at 5. Because Defendants' intent is irrelevant under the Fourth Amendment, the pertinent question is whether it was *objectively* unreasonable for Defendants to keep Plaintiff in handcuffs for as long as they did.

18

"'Courts apply a separate standard to claims for excessive force in the use of handcuffs,'" *Sachs v. Cantwell,* No. 10 Civ. 1663, 2012 WL 3822220, at *14 (S.D.N.Y. Sept. 4, 2012), which "reflects the need for a careful balance." *Usavage v. Port Auth. of New York & New Jersey*, 932 F. Supp. 2d 575, 592 (S.D.N.Y. 2013). "Although handcuffs must be reasonably tight to be effective, overly tight handcuffing can constitute excessive force." *Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 468-69 (S.D.N.Y. 2008) (collecting cases) (citations omitted). In evaluating the reasonableness of a handcuffing, the Court must consider the "amount of force necessary to maintain custody," as well as "evidence that: (1) the handcuffs were unreasonably tight; (2) the defendants ignored the arrestee's pleas that the handcuffs were too tight; and (3) the degree of injury to the wrists." *Esmont v. City of New York*, 371 F. Supp. 2d 202, 215 (E.D.N.Y. 2005) (citations omitted). "As always, this inquiry must reflect the totality of the circumstances, including any facts that bear on whether use of an unusual degree of force may have been justified." *Usavage*, 932 F. Supp. 2d at 592 (citing *Matthews v. City of New York,* 889 F. Supp. 2d 418, 442–43 (E.D.N.Y. Sept. 5, 2012)).

The injury requirement is "particularly important." *Id.* at 592 (citing *Sachs,* 2012 WL 3822220, at *14). "There is a consensus among courts in this circuit that tight handcuffing does not constitute excessive force unless it causes some injury beyond temporary discomfort." *Lynch,* 567 F. Supp. 2d at 468. To prevail, a plaintiff's injuries "need not be 'severe or permanent,' but must be more than merely 'de minimis.'" *Usavage*, 932 F. Supp. 2d at 592 (quoting *Vogeler v. Colbath,* No. 04 Civ. 6071, 2005 WL 2482549, at *9 (S.D.N.Y. Oct. 6, 2005); *Washpon v. Parr*, 561 F. Supp. 2d 394, 407 (S.D.N.Y. 2008)). "The most common injuries found to satisfy the injury requirement in handcuff cases are scarring and nerve damage." *Id.* (citations omitted).

To start, the record supports Plaintiff's assertion that he was handcuffed from 9:16 a.m. until his transfer to the Westchester County Jail (except for when Castiglia replaced his handcuffs with another set). Although Defendants intimate that they had the capacity to remove his handcuffs once he was transferred from the holding cell to the cell block at 12:00 p.m., they offer no evidence to show that his handcuffs were in fact removed at that time.

On the other hand, Defendants have provided evidence to show that D'Erasmo and Castiglia did not have custody of Plaintiff during the entirety of his detention at the New Rochelle police station. They assert that D'Erasmo drove immediately from the show-up identification to the hospital in order to receive medical care for the injuries he sustained when Plaintiff head-butted him and had no further interactions with Plaintiff after that point. They also assert that Castiglia's involvement with Plaintiff ended at 11:09 a.m., when he completed the booking process. Plaintiff refutes neither contention. Yet, "[i]In this Circuit, personal involvement of a defendant is a prerequisite to a damages award for a § 1983 claim[,]" and, for the purposes of an excessive force claim, "can be shown where a police officer directly participates in an assault, or was present during the assault with reasonable opportunity to intercede on plaintiff's behalf yet failed to do so." *Espada v. Schneider*, 522 F. Supp. 2d 544, 555 (S.D.N.Y. 2007) (citations omitted). Under the "failure to intervene" theory, a plaintiff must prove that the defendant "(1) possessed actual knowledge of the use . . . of excessive force; (2) had a realistic opportunity to intervene and prevent the harm from occurring; and (3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force." *Fudge v. Jones*, No. 5:11 Civ. 525 (DNH), 2014 WL 4684861, at *5 (N.D.N.Y. Sept. 19, 2014) (citations omitted).

Accordingly, Plaintiff's excessive force claim is dismissed as to D'Erasmo's role in his handcuffing.  With regard to Castiglia, the relevant inquiry is whether he behaved unreasonably by declining to remove Plaintiff's handcuffs from 9:16 a.m. to 11:09 a.m., a period of less than two hours, or whether he had knowledge that Plaintiff would be harmed by remaining in handcuffs after that point and failed to intervene.

First, it is clear that Plaintiff's handcuffs caused him discomfort when Castiglia first put them on.  Immediately after Plaintiff was handcuffed, he demanded several times that Castiglia "fix [his] cuffs."  *See* Doc. 46, Ex. U; *Lynch*, 567 F. Supp. 2d at 468 (crediting plaintiff's testimony that his handcuffs were excessively tight absent any reason to doubt that assertion).  A short time later, while Plaintiff was being transported to a show-up identification at the Mini Mart, he asked Castiglia, "You're not gonna loosen my cuffs?" *Id.*  After the show-up identification, on the way to the police station, Plaintiff informed Castiglia that the handcuffs were "twisted."  *Id.*  And during Plaintiff's search by Castiglia at the police station, Plaintiff shouted in pain and stated that the handcuffs were "on wrong."  Doc. 46, Ex. X.  Based on these requests and statements, the Court credits Plaintiff's assertion that his handcuffs were either too tight or incorrectly applied.

Next, the Court considers whether Castiglia "ignored [Plaintiff's] pleas."  *Esmont*, 371 F. Supp. 2d 215.  It is true that, at the beginning of the arrest, when Plaintiff ordered Castiglia to "fix [his] cuffs," Castiglia disregarded this demand and continued trying to force Plaintiff into the car.  Doc. 46, Ex. U.  But by the time Plaintiff next asked Castiglia to "loosen [his] cuffs," Plaintiff had head-butted and repeatedly threatened to kill him, and the two were alone.  As Defendants point out, it was reasonable for Castiglia to believe that he could not safely adjust the handcuffs under those circumstances.  Defs.' 56.1 Statement ¶¶ 151-52.  Moreover, when

Castiglia informed Plaintiff that the handcuffs were "staying on now," Plaintiff did not indicate that he was in pain.  Instead, he responded, "Yea, they are, cause you know I'ma knock you the fuck out!  I'ma knock you the fuck out soon as these cuffs come off! . . . Soon as these cuffs come off, son, I'ma knock you out! . . . You see I was head-butting you nigga!"  Doc. 46, Ex. U. Even so, when they arrived at the station, after Plaintiff complained that the handcuffs were "twisted" and "on wrong," Castiglia removed and replaced them.  *Id.*, Exs. U, X; Defs.' 56.1 Statement ¶ 167.  Although Plaintiff complained about his handcuffs several more times while detained in the holding cell—namely by asking why he was handcuffed while "behind a gate," stating that he could not harm anyone while held in a cell, and asking various officers to remove his handcuffs—he did not complain that the handcuffs were on wrong, too tight, or causing him any pain.  And when Castiglia was within range, Plaintiff threatened to kill him and spat on him. In light of these facts, it cannot be said that Castiglia ignored Plaintiff's pleas.

As for the degree of injury, Plaintiff asserts that he experienced numbness, tingling, and loss of motion immediately following his arrest, and that the numbness and tingling persist still today.  Presently, his only treatment is Ibuprofen, and he is capable of working with his hands and playing basketball.  Franks Depo. at 90-92, 111-14.  Asked, during his deposition, whether he was given a diagnosis as to what was wrong with his hands when he sought treatment in the Westchester County Jail, Plaintiff stated that he could not recall the exact words, but, in substance, "It was something to do [with] nerve damage."  *Id.* at 88-89.  Finally, along with his opposition to Defendants' summary judgment motion, Plaintiff submitted three medical reports from the New York State Department of Correctional Services Health Services System, dated October 29, 2014, January 12, 2015 and March 23, 2015.  Pl.'s Opp'n, Ex. A.[20]  The first noted

---

[20] Each of these reports pertain to medical consultations that took place after the filing of Plaintiff's lawsuit.

that the reason for Plaintiff's consultation was "pain paresthesia both hands, L worse X 1 yr."[21] On the second report, under "Reason for Consultation," someone typed:  "Paresthesia both hands left worse than R.  Symptoms both ulnar and radial aspect. . . . Nerve conduction normal.  No hand deformity.  Feels a little weak but not drop things.  Programs not a problem."  Beneath that are handwritten notes, observing, among other things, "Cramping L > R hand & paresthesia for 2 years.  Can tighten up & can't relax hand."  The third and final report states, under "Reason for Consultation":  "Nerve conduction test normal seen by BR Robert Beach, Neurologist who recommended Pt see Dr. Jubelt at his next clinic neurologist with more expertise in neuropathy."  Handwritten notes on the third report are largely unintelligible but legibly state, "Probably has thoracic outlet syndrome on the left."[22]

Construing, as the Court must on a summary judgment motion, Plaintiff's assertions and reports in the light most favorable to him, they do not establish that his injuries were *de minimis*. But neither do they establish, as a matter of fact, injuries that would lead the Court to conclude that Plaintiff's handcuffing rose to the level of excessive force.  *See Matthews*, 889 F. Supp. 2d at 442 (noting that "'[u]nsubstantiated claims of nerve damage, in the absence of corroborating medical evidence, are insufficient' to sustain a claim of excessive force from handcuffing") (quoting *Esmont,* 371 F. Supp. 2d at 215).  In addition, even if Plaintiff's medical evidence more roundly supported his allegation of nerve damage, he has not adduced any evidence to suggest

---

[21] "Paresthesia refers to a burning or prickling sensation that is usually felt in the hands, arms, legs, or feet, but can also occur in other parts of the body.  The sensation, which happens without warning, is usually painless and described as tingling or numbness, skin crawling, or itching."  NINDS Paresthesia Information Page, National Institute of Neurological Disorders and Stroke, http://www.ninds.nih.gov/disorders/paresthesia/paresthesia.htm (last visited Aug. 12, 2015).

[22] "Thoracic outlet syndrome (TOS) causes pain in the arm, shoulder, and neck. It happens when the nerves or blood vessels just below your neck are compressed, or squeezed. . . . There are many causes of TOS, including . . . [i]njury . . . . Treatment depends on what caused your TOS.  Medicines, physical therapy, and relaxation might help. Surgery may also be an option. Most people recover."  Thoracic Outlet Syndrome, Medline Plus, U.S. National Library of Medicine, http://www.nlm.nih.gov/medlineplus/thoracicoutletsyndrome.html (last visited Aug. 12, 2015).

that the numbness and pain of which he complains could have resulted from the two hours during which he was handcuffed while still in Castiglia's custody as opposed to the period of time after his transfer to the holding cell.

Finally, given the amount of force that was "necessary to maintain custody," *Esmont*, 371 F. Supp. 2d 215, Castiglia's behavior is beyond reproach.  Although Plaintiff requested that Castiglia remove his handcuffs, he also threatened to harm Castiglia once the handcuffs were removed and repeatedly reminded Castiglia that he had successfully assaulted him even while wearing handcuffs.  Doc. 46, Exs. U, X.  Although Plaintiff maintains that he had not done anything violent to justify his prolonged handcuffing, *see, e.g.*, Pl.'s Opp'n at 4-5 ("Videotapes of the incident were reviewed and showed no sign of a struggle or resist in any way, shape or form"), this claim is flatly belied by the record, and specifically by numerous videos which depict Plaintiff verbally and physically threatening Castiglia, D'Erasmo, and other officers.  And although Plaintiff was eventually transferred to a cell block where it would have been safe to remove his handcuffs, Castiglia's involvement with Plaintiff ended nearly forty minutes before that transfer, and Plaintiff does not allege that Castiglia failed to intervene in harm or excessive force that occurred after that time.  Ultimately, despite Plaintiff's claim to lasting injury, it was reasonable for Castiglia to leave him in handcuffs throughout the entirety of time that Plaintiff was in his custody, a period of less than two hours, until he could be transported to a cell block where his handcuffs could be safely removed.  Plaintiff's claims are dismissed as to Castiglia's, as well as D'Erasmo's, role in his handcuffing.

### 2. *Force During Arrest*

Although Plaintiff's papers focus primarily on the duration and nature of his handcuffing, he also contends that Officers D'Erasmo and Castiglia used excessive force during his actual

arrest.  Construing Plaintiff's allegations in the strongest light possible, he claims that

Defendants pushed him and pulled him during his arrest, that Castiglia choked him, and that

Officer D'Erasmo applied pressure to his neck.  *See* Amended Compl. at II.D. ("Officer Castiglia

took the liberty to pull my hooded sweatshirt while Officer D'Erasmo put his forearm in my neck

to force me in the back seat of their patrol car.  At this time I was already in handcuffs so there

was no need for the excessive force.").  As described above, Plaintiff's claim is supported by the

patrol car video, which depicts Castiglia appearing to use a chokehold and constricting Plaintiff's

breathing by pulling on the hood of his sweatshirt for approximately fifteen seconds during

which Plaintiff screamed and gasped for air.[23]  However, Plaintiff does not allege that he was

injured as a result of the force applied by the officers during that portion of his arrest.

"[T]here is some inconsistency among lower courts on the question of how seriously a

plaintiff must be injured in order to prevail on a Fourth Amendment excessive force claim."

*McCord v. City of New York*, No. 13 Civ. 2008 (AJN), 2014 WL 2567108, at *4 (S.D.N.Y. June

6, 2014) (citing *Robinson v. Via,* 821 F.2d 913, 923 (2d Cir. 1987); *Yang Feng Zhao v. City of

New York,* 656 F. Supp. 2d 375, 390-91 (S.D.N.Y. 2009)).  While a plaintiff need not allege

"permanent or severe" injury to prevail on an excessive force claim, *Robinson,* 821 F.2d at 924,

"a plaintiff must present sufficient evidence to establish that 'the alleged use of force is

'objectively sufficiently serious or harmful enough' to be actionable."  *Washpon*, 561 F. Supp.

2d at 406-07.  And "[d]e minimis injury can serve as conclusive evidence that de minimis force

was used."  *Id.* at 407 (citing *Carr v. Deeds,* 453 F.3d 593, 606 (4th Cir. 2006)); *see also*

---

[23] Defendants essentially ignore this portion of Plaintiff's allegations in their moving and reply papers, seeming to assume that Plaintiff proceeds solely on the theory that he was subjected to excessive force via the period of time during which he was handcuffed.  However, Plaintiff clearly refers in his Amended Complaint to the force applied to his neck.  Further, while his opposition papers state that he withdraws all claims besides his excessive force claim and focus almost exclusively on his handcuffing, he nowhere indicates that he wishes to withdraw the remainder of his excessive force allegations, which are arguably supported by the video evidence in the record.

*Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir. 1993) ("A de minimis use of force will rarely suffice to state a Constitutional claim."); *Yang Feng Zhao*, 656 F. Supp. 2d at 390 (noting that "the extent and nature of the injury, if any, is typically relevant in an arrest context not merely on the question of the amount of damages, but also because it is probative of the amount and type of force actually used by the arresting officers, and that in turn is likely to reflect on the reasonableness of that force).  Indeed, numerous courts in this district have granted summary judgment against plaintiffs who fail to allege any injury in support of excessive force claims. *See McAllister v. New York City Police Dep't*, 49 F. Supp. 2d 688, 699 (S.D.N.Y. 1999); *Murphy v. Sr. Investigator Neuberger*, No. 94 Civ. 7421 (AGS), 1996 WL 442797, at *8 (S.D.N.Y. Aug. 6, 1996); *Landy v. Irizarry*, 884 F. Supp. 788, 799 (S.D.N.Y. 1995) ("Plaintiff alleges no injury as a result of being kicked.  An arrestee must prove some injury, even if insignificant, to prevail in an excessive force claim.") (citing *Knight v. Caldwell,* 970 F.2d 1430, 1432 (5th Cir. 1992), *cert. denied,* 507 U.S. 926 (1993)).

However, other courts have reasoned, persuasively, that to focus on the severity of an arrestee's injury as opposed to the reasonableness of an officer's use of force is to focus "on the wrong question."  *Chambers v. Pennycook*, 641 F.3d 898, 906 (8th Cir. 2011).  As one court observed, in *Yang Feng Zhao v. City of New York*, "the notion that the injury must be more than '*de minimis*' to trigger an assessment of a Fourth Amendment claim appears unjustified," 656 F. Supp. 2d at 390, and, were the law to require a greater showing of injury, "the result could be plainly perverse."  *Id.* at 390 n. 9 (considering the possibility of an excessive force claim where a "physically passive suspect" is slapped or punched but left with no broken bones or bruises, or where an arrestee is waterboarded but left with no long-term injuries, fractures, or need for treatment).  On similar logic, a court in the Middle District of Alabama denied summary

judgment where an arrestee picked up on a minor infraction was placed in a five to ten second

chokehold while handcuffed after he refused to get into a police car. *Marshall v. West*, 559 F.

Supp. 2d 1224, 1244 (M.D. Ala. 2008). The court concluded that "the quantum of force was

objectively unreasonable given the purpose for which it was applied," even in light of Plaintiff's

minor injuries. *Id.* at 1234, 1244. The facts here are nearly identical.

   In this case, Plaintiff fails to allege any major injury stemming from the purported

choking to which he was subjected during his arrest. Nevertheless, whether the officers' use of

force was objectively reasonable—against the backdrop of Plaintiff's strenuous refusal to get

into the police car and the relatively minor crimes for which he was arrested—is a question best

left to the considered judgment of a jury, whose role it is "to determine the amount of force used,

the injuries suffered and the objective reasonableness of the officer's conduct." *Breen v.

Garrison*, 169 F.3d 152, 153 (2d Cir. 1999) (citing *Anderson v. Branen,* 17 F.3d 552, 559–60 (2d

Cir. 1994); *Miller v. Lovett,* 879 F.2d 1066, 1069–70 (2d Cir. 1989)). Reasonable minds may

differ on the issue of whether it was necessary for Castiglia to use as much force as he did; that

question of reasonableness presents a genuine issue for the jury to evaluate at trial.

   Although Plaintiff's papers with regard to this encounter are bare-bones, his claim against

Castiglia arguably is supported by video evidence. Therefore, summary judgment against

Castiglia is denied as to his purported use of a chokehold and his constricting Plaintiff's

breathing by pulling on his hooded sweatshirt. On the other hand, Plaintiff offers no evidence

beyond his unsupported assertions to bolster his claim that Officer D'Erasmo applied

inappropriate pressure or force during the arrest. *See Roundtree v. City of New York*, 778 F.

Supp. 614, 622 (E.D.N.Y. 1991) ("[T]o conclude that a 'push' that does not cause the slightest of

physical injuries to the plaintiff is nonetheless an actionable use of excessive force would be to

hold that *any* physical contact by an arresting officer with the arrested person is actionable."). Nor can Plaintiff demonstrate that, in the fifteen seconds during which Castiglia allegedly used excessive force, Officer D'Erasmo had a realistic opportunity to intervene and refused to do so. Plaintiff's excessive force claim against D'Erasmo is therefore dismissed in its entirety.

### 3.   *Qualified Immunity*

The doctrine of qualified immunity does not alter the Court's conclusion as to Castiglia. A government official sued in his individual capacity is entitled to qualified immunity (1) if the conduct attributed to him was not prohibited by federal law; or (2) where the conduct was so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time it occurred; or (3) if the defendant's action was objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken. *Manganiello v. City of New York*, 612 F.3d 149, 164 (2d Cir. 2010) (internal citations omitted). As the Second Circuit explained in *DiStiso v. Cook*, qualified immunity "affords government officials breathing room to make reasonable—even if sometimes mistaken—decisions, and protects all but the plainly incompetent or those who knowingly violate the law from liability for damages."  691 F.3d 226, 240 (2d Cir. 2012) (internal citations and quotation marks omitted). Therefore, "[w]hether qualified immunity applies in a particular case generally turns on the objective legal reasonableness of the challenged action, assessed in light of the legal rules that were clearly established at the time it was taken."  *Id.* (internal quotation marks and citations omitted).  Under a qualified immunity analysis, a court should first decide whether the facts that a plaintiff has alleged make out a violation of a constitutional right, and then whether the right at issue was clearly established at the time of defendant's alleged misconduct.  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  Nonetheless, it may exercise its "sound discretion in

deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236.

With respect to Fourth Amendment excessive force claims, courts in this Circuit have made clear that, "[s]ince the law in this area is well-established . . . the qualified immunity inquiry is the same as the inquiry made on the merits." *Washpon*, 561 F. Supp. 2d at 407-08 (internal quotation marks and citation omitted). As noted above, there is a genuine dispute with respect to the merits of Plaintiff's excessive force claim. Thus, the Court is unable to determine whether Castiglia's actions were objectively reasonable in light of the legal rules that were clearly established at the time it was taken and, to the extent that his motion for summary judgment is premised on a qualified immunity defense, it is denied.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED in part and DENIED in part. Plaintiff's excessive force claim is dismissed against D'Erasmo and against Castiglia with regard to the duration and nature of Plaintiff's handcuffing; his excessive force claim against Castiglia survives with regard to the officer's conduct in allegedly causing Plaintiff to choke while attempting to place him in the back of the patrol car. Furthermore, the Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Opinion and Order would not be taken in good faith; therefore, *in forma pauperis* status is denied for purposes of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

The Clerk of the Court is respectfully directed to (1) terminate the motion, Doc. 45, (2) terminate D'Erasmo as a defendant in this case, and (3) mail a copy of this Opinion and Order to Plaintiff. The remaining parties shall appear for a pretrial conference on Friday, October 2, 2015 at 12:00 p.m., at which time the Court will set a trial date, a final pretrial

conference date, and a schedule for all pretrial filings.  Castiglia's counsel shall appear in person for the conference, and Plaintiff shall appear telephonically.

      It is SO ORDERED.

Dated:     August 18, 2015
            New York, New York

                                        Edgardo Ramos, U.S.D.J.